QUINCE ORCHARD VALLEY CITIZENS ASSOCIATION, INC.; West Riding Citizens Association, Inc., Plaintiffs–Appellants,

v.

Donald P. HODEL, as Secretary of the U.S. Department of Interior; James H. Burnley, IV, as Secretary of the U.S. Department of Transportation; Raymond A. Barnhart, as Administrator of the Federal Highway Administration; Sidney Kramer, as County Executive of Montgomery County; Robert McGarry, as Director of Montgomery County Department of Transportation; Elvin R. Heiberg, III, General, as Commander of the U.S. Army Corps of Engineers, Defendants–Appellees.

No. 88–2803.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 4, 1988.

Decided April 7, 1989.

Randal Michael Shaheen (David S. Eggert, Arnold & Porter, on brief), for plaintiffs-appellants.

Michael Paul Healy (David F. Shuey, Dirk D. Snel, Dept. of Justice, Roger J. Marzulla, Asst. Atty. Gen., Breckinridge L. Willcox, U.S. Atty., David P. King, Asst. U.S. Atty., on brief), Joseph Michael Mott (Miles & Stockbridge, on brief), for defendants-appellees.

Before ERVIN, Chief Judge, BUTZNER, Senior Circuit Judge, and JACKSON L. KISER, United States District Judge for the Western District of Virginia, sitting by designation.

ERVIN, Chief Judge:

The Quince Orchard Valley Citizens Association and the West Riding Citizens Association ("the Associations") filed this action for declaratory and injunctive relief. The Associations hope to halt construction of a new four lane road, the proposed Great Seneca Highway, through the Seneca State Park. They contend that officials of Montgomery County, Maryland ("the County") and various federal agencies connected with this road project have failed to comply with environmental laws which protect the park. Noting that the Associations delayed in bringing this action until six months after all necessary federal approvals for the project had been granted, the district court denied the Associations' motion for a preliminary injunction. The Associations then brought this appeal. Finding no abuse of discretion in the district court's decision, we affirm.

## I

Although the facts and procedural history of this case are rather involved, the parties' basic dispute can be easily summarized. In 1971 the County began planning construction of the Great Seneca Highway to alleviate traffic congestion in the Gaithersburg–Germantown area. The Seneca Creek State Park is comprised of roughly six thousand acres along twelve miles of the banks of the Seneca Creek. The park lies squarely between Gaithersburg and Germantown in the middle of the highway's path. Both sides concede that the highway must traverse the park at some point. They strongly disagree, however, over how to route the highway through the park. Several alternative routes have been proposed. The County prefers a plan, or "alignment", known as Alternate 2A. This plan calls for the construction of a new four lane divided highway which will convert 21 acres from park to road use and require the filling of 2.7 acres of wetlands. The Associations prefer either Alternate 4 or 6, which merely involve widening and improving roads that already run through the park. Each of these alignments requires several miles of new road surface to be built on either side of the park although, obviously, the alignment of these approaching road sections will depend upon where the highway eventually crosses the park.

Before sketching the protracted history of this litigation, it will be helpful to note the various federal statutes which apply to the Great Seneca Highway project. These statutes require a number of federal agencies to study the proposed alignments, to make certain factual findings regarding the environmental consequences of each alignment, and to issue construction permits or approvals for the best alignment in accordance with these findings. The eventual resolution of the underlying dispute will turn on the merits of the parties' contentions under these statutes.

The parties agree that no matter which alignment is eventually chosen, section 6(f) of the Land and Water Conservation Fund Act, 16 U.S.C. § 460*l*–8(f)(3) ("the Conservation Act"), requires the County to obtain the approval of the National Park Service ("NPS") before converting park land to road use. The conversion of park land may be approved "only if [the NPS] finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as [the NPS] deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location." 16 U.S.C. § 460*l*–8(f)(3). The Conservation Act applies here because, although the park is owned by Maryland, it was purchased with federal financial assistance. The NPS granted approval for Alternate 2A in June of 1987. *See,* 52 Fed.Reg. 23724 (June 18, 1987). The Associations assert that this approval is contrary to law because the NPS, in its Record of Decision, did not consider "all practicable alternatives" or make any finding that Alternate 2A was the only "prudent and feasible alternative that minimized harm" to the park. The Associations argue that such a finding is required by NPS regulations. *See,* 36 C.F.R. 59.3. The County and the federal defendants, of course, assert that the record of decision reveals that the proper findings were made.

The parties also recognize that because Alternate 2A requires filling and dredging of almost three acres of wetlands in the park, the County must obtain the approval of the Army Corps of Engineers ("the Corps") pursuant to section 404 of the Water Pollution Control Act, 33 U.S.C. § 1344 ("the Water Act"). Regulations under the Water Act prohibit the issuance of a wetlands permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 210.10(a). Here again, the Associations assert that the Corps failed to undertake the reviews and make the environmental findings required by law. In support, the Associations point out that Alternate 4 would require no wetlands construction and Alternate 6 would only impact upon 1.6 acres.

The Associations also argue that section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303 ("the Transportation Act") applies. Section 4(f) requires the Federal Highway Authority ("the FHWA") to make certain environmental determinations before approving federally funded transportation programs which require the conversion of public park land. The County contends, with the apparent agreement of the Secretary of Transportation, that section 4(f) does not apply here because this project is not federally funded. To date no application for federal assistance has been submitted, although it does appear that the County received some $245,-000 in federal planning funds.

Finally, the National Environmental Protection Act (NEPA) requires the foregoing federal agencies to prepare an Environmental Impact Statement ("EIS") concerning the alternative alignments before granting their respective approvals. *See Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (CA4 1987). The FHWA, acting as the lead agency for this project, issued a final EIS contemporaneously with the NPS park land conversion approval. The Associations allege a number of deficiencies in the EIS, based upon the FHWA's failure to supplement its conclusions as a result of alleged changes in population forecasts for the Germantown area.

## II

This is the second time that this court has traveled the Great Seneca Highway's proposed alignments. In 1984, prior to any federal approval, the County obtained easements and began building those sections of Alternate 2A that lie outside the park. The Associations then filed suit in the United States District Court for the District of Maryland. The Associations sought to enjoin all construction along Alternate 2A approaching the park until the County obtained the necessary federal approvals of a final alignment through the park. The complaint stated, among other things, that federal approval of the eventual park alignment was required under a variety of environmental statutes, and therefore the National Environmental Protection Act (NEPA) required the County and the relevant federal agencies to prepare an Environmental Impact Statement ("EIS") concerning the alternative alignments. The Associations argued that ongoing or completed construction along Alternate 2A outside the park would necessarily prejudice federal environmental review and cost-benefit analyses of all the proposed alignments. The district court, however, dismissed the Associations' complaint on the grounds that state financed construction of Alternate 2A on land outside the park was not a "federal action" subject to the strictures of NEPA.

This court reversed. In *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (CA4 1987), we held that NEPA applied because the highway's final alignment through the park must be approved by federal decision makers. The court reasoned that:

> Because the highway, wherever located, must inevitably cross Seneca Creek State Park, a park established with a grant of substantial federal funds, the approval of the Secretary of the Interior for conversion of park land to other than public outdoor recreation uses will be required. Conservation Act § 6(f), 16 U.S.C. § 4601–8(f)(3). In addition, it is alleged that the section of the highway which will cross the park will impinge on wetlands when it crosses Seneca Creek so that a permit from the Secretary of the Army to dredge wetlands will be required pursuant to the provisions of § 404 of the Water Act, 33 U.S.C. § 1344. Finally, if defendants seek additional federal funds for the construction of the highway, they will be required to obtain the approval of the Secretary of Transportation for the use of park land for a transportation program under § 4(f) of the Transportation Act, 49 U.S. C. § 303(c). In each instance, each Secretary will be required to consider a final EIS before exercising his or her authority.

.     .     .     .     .

Because of the inevitability of the need for at least one federal approval, we think that the construction of the highway will constitute a major federal action.

Because it is inevitable that the construction of the highway will involve a major federal action, it follows that compliance with NEPA is required before any portion of the road is built. This conclusion effectuates the purpose of NEPA. The decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. The completed segments would "stand like gun barrels pointing into the heartland of the park ..."

*Gilchrist*, 808 F.2d at 1042. The case was then remanded to the district court for consideration of the merits of the Associations' NEPA claims and their motion for a preliminary injunction.

On remand, the district court declined to preliminarily enjoin construction. Then, while the parties were proceeding with discovery, the NPS granted the approval required by section 6(f) of the Conservation Act, and adopted a Final EIS. *See* 52 Fed. Reg. 23724 (June 18, 1987). The Associations recognized that this approval mooted the issues raised by their complaint. Since they nevertheless remained opposed to eventual construction along Alternate 2A, the Associations were faced with a choice. They could amend their original complaint to challenge the lawfulness of the NPS's approval and the sufficiency of the EIS, or face dismissal of their cause. Curiously, the Associations agreed to a voluntary dismissal which was granted, with prejudice, on July 10, 1987.

Almost eight months later, and roughly nine months after the Park Service gave its approval to Alternate 2A, the Associations filed suit again, this time in the United States District Court for the District of Columbia. Requesting declaratory and injunctive relief, the complaint in this second action challenged: (1) the lawfulness of the NPS's approval pursuant to Section 6(f); (2) the lawfulness of the Corps' approval pursuant to section 404 of the Water Act; (3) the FHWA's decision that section 4(f) of the Transportation Act did not apply; and (4) the adequacy of the final EIS. The Associations also requested a preliminary injunction. It is important to make clear, at this point, the difference between the issues raised by this complaint and those present in *Gilchrist, supra.* In *Gilchrist*, the Associations sought to enjoin all construction pending federal agency decisions to approve or reject Alternate 2A. The present action directly challenges the sufficiency of the federal approvals which have now been issued.

On the County's motion, the case was transferred to the United States District Court in Maryland. There, the Associations renewed their motion for a preliminary injunction. The parties submitted a Joint Statement of Facts and Issues. After hearing several hours of oral argument, the district court denied the motion. The Associations then brought this appeal.

### III

The decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court. That decision will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently. *See Wetzel v. Edwards*, 635 F.2d 283 (CA4 1980). A district court abuses its discretion "by applying an incorrect preliminary injunction standard, by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." *Goldie's Bookstore v. Super. Ct. of State of California*, 739 F.2d 466, 470 (CA9 1984). *See also SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (CA9 1985); and *White House Vigil for ERA Committee v. Watt*, 717 F.2d 568 (CADC 1983).

Principles settled and sure guide a trial court's determination of whether to grant

or withhold interim injunctive relief. The analysis begins with attention to four preliminary determinations about the case at hand: (1) plaintiff's likelihood of success on the merits of the underlying dispute; (2) whether the plaintiff will suffer irreparable harm if interim relief is denied; (3) the harm to the defendant if an injunction is issued; and (4) the public interest. *North Carolina State Ports Authority v. Dart Containerline Co. Ltd.*, 592 F.2d 749 (CA4 1979). The trial court must then weigh each of these factors in light of the " 'flexible interplay' among all the factors considered." *Blackwelder Furn. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (CA4 1977). "If the likelihood of success [on the merits] is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify the issuance of the injunction." *State Ports Authority*, 592 F.2d at 750. Finally, the court must balance the potential harm to the plaintiff, if relief is denied, against the potential harm to the defendant if an injunction issues. In striking this balance, a trial court must be mindful of the effect of the decision, if any, on broader concerns of public interest.

The district court properly applied these principles in its decision to deny the Associations' motion for a preliminary injunction. First, the court evaluated each of the Associations' challenges to the various federal approvals and determined that those challenges were unlikely to succeed. Second, the court balanced the harms. The Associations asserted that they would suffer irreparable injury if the allegedly improperly approved construction progressed, since any further commitment of resources to Alternate 2A could make any future abandonment of that alternative prohibitively expensive. The district court viewed this assertion skeptically, however, because of the Associations' delay in bringing this action. As noted previously, the Associations waited a full nine months until after the NPS granted the necessary approval under section 6(f) of the Conservation Act and the FHWA issued the final EIS. Nearly six months elapsed between the issuance of the section 404 wetlands construction permit and the filing of the complaint. The County, on the other hand, asserted that any delay could significantly increase construction costs and interfere with contractual obligations entered into between the County and the construction firms subsequent to the NPS approval. The County also represented that, during the nine months preceding this action, some $7.1 million was expended in planning and constructing Alternate 2A.

The district court concluded that the balance of hardships favored the County. In an opinion delivered from the bench, the court stated:

> All the facts that the Plaintiffs [Associations] needed to bring this action were known to them at least six months before they requested preliminary relief. During oral argument, Plaintiffs' counsel proffered to the Court that the Plaintiffs would be prepared for trial within two or three months. If Plaintiffs had proceeded with this action expeditiously when the record was complete six months ago, it would not have been necessary for Plaintiffs to make their present request for extraordinary injunctive relief.... Thus, the Plaintiffs could have received a trial on the merits long before the awarding of the construction contract. Whatever irreparable harm Plaintiffs face from the impending construction along Alternate 2A is very much the result of their own procrastination.

(JA, 336).

On the facts of this case, the district court acted well within its discretion in striking the balance of harms in favor of the defendants. This dispute could well have been resolved on the merits during the nine months that elapsed after the final EIS and the Park Service approval were issued. The district court was therefore justified in concluding that much of the Associations' potential harm was a product of its own delay in pursuing this action. As the court below recognized, "laches is not a favored defense in environmental cases." *Coalition for Canyon Preserva-*

**80**

tion v. Bowers, 632 F.2d 774 (CA9 1980). Laches has not, however, been applied here to foreclose consideration of this case on its merits. "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (CA2 1985). *See also Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (CA2 1985) ("Lack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm ..."). The Associations' delay is thus quite relevant to balancing the parties' potential harms. "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F.Supp. 542, 543 (M.D.Pa.1973). *See also Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213 (CA9 1984) (finding grant of preliminary injunction to be an abuse of discretion because, inter alia, the plaintiff waited four months after notification of adverse zoning decision before bringing suit); and *Brookhaven Housing Coalition v. Kunzig*, 341 F.Supp. 1026 (E.D.N.Y.1972) (noting plaintiffs' year long delay, district court refused to preliminarily enjoin occupation of a new federal office building allegedly constructed in violation of Executive Order No. 11512).

Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public construction projects do so with haste and dispatch. To require any less could well result in costly disruptions of ongoing public planning and construction. The court below found that "during the last fiscal year the Court [sic] (County) has invested a significant amount on the design and planning of the last phase of the project, that is the construction of the highway through the park along Alternate 2A. This could have been obviated if Plaintiffs had diligently brought suit. In addition,

the cost of the next phase of the project increases to the Defendants if the construction contract is delayed, further delayed until after trial." J.A. 337. Where such disruptions could easily be avoided by promptly challenging administrative decisions, the denial of preliminary relief lies well within the sound discretion of a trial judge. The decision below is

AFFIRMED.