**524**

MURROW FURNITURE GALLERIES, INC.; Turner Tolson, Inc.; Thornton Furniture Co., Inc.; the Furniture House of N.C., Inc.; A & H Wayside Furniture, Inc.; Homeway Furniture Company of Mt. Airy, Inc.; Sobol House of Furnishings, Inc.; Utility Craft, Inc.; Rose Furniture Co., Inc.; Annex Furniture Co.; Country Furniture Co., Inc.; Shaw Furniture Galleries, Inc.; High Point Furniture Sales, Inc., Plaintiffs–Appellants,

v.

THOMASVILLE FURNITURE INDUS-
TRIES, INC., Defendant–Appellee
(Two Cases).

Nos. 88–3596, 88–3597.

United States Court of Appeals,
Fourth Circuit.

Argued April 12, 1989.

Decided Nov. 17, 1989.

John McNeill Smith (Richard D. Ehrhart, Linda S. Bellows, Smith, Helms, Mulliss & Moore, Greensboro, N.C., on brief), for plaintiffs-appellants.

Mark Nixon Poovey (W. Andrew Copenhaver, Thomas L. Nesbit, Womble, Carlyle, Sandridge & Rice, Winston–Salem, N.C., Jerome C. Finefrock, Armstrong World Industries, Inc., Lancaster, on brief), for defendant-appellee.

Before HALL, PHILLIPS and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Murrow Furniture Galleries, Inc., and others (the North Carolina Discounters)[1] appeal from a judgment of the district court which denied them a preliminary injunction against Thomasville Furniture Industries, Inc., and encompassed other rulings adverse to their claims. The controversy underlying the appeal concerns the impact of Thomasville's change in marketing strategy upon this group of North Carolina retailers. The Discounters traditionally have conducted part of their business over the telephone and through the mail, selling name brand furniture at reduced rates to consumers in other states. This dispute resulted when Thomasville effected sales policies which, among other things, curtailed telephone discounting. The Discounters brought this action claiming violations of federal antitrust and state unfair

---

**1.** The Discounter plaintiffs include Murrow and twelve other owner-operated retail furniture stores.

trade practice statutes. The court below refused to grant a preliminary injunction restraining Thomasville from applying its revised marketing strategy to the Discounters. The court also dismissed some of the Discounters' claims and denied permission to amend their complaint. The Discounters appeal. We affirm in part, and reverse and remand in part.

## I. Facts

In 1982 Thomasville had sales to retailers of $130 million and profits under $2 million. By 1987 sales had doubled to $260 million, but profits had increased even more dramatically, to over $27 million. This upsurge in profitability coincided with a sharp reduction in the number of authorized Thomasville retailers—from over 4,000 in 1982 to 555 in 1987. Thomasville attributes its increased profitability to its new Authorized Retailer Sales Policies and Thomasville Gallery Program. The sales policies emphasize "showroom" selling, set up, and warranty service. Dealers in the Gallery Program are required to establish large showrooms, displaying Thomasville furniture in room-like settings. Establishing a gallery requires a $150,000 to $250,000 retailer investment. Both policies manifest a Thomasville commitment to encouraging consumers to shop for furniture locally.

This strategy inevitably conflicted with the activities of the Discounters, who function as full-service retailers in their North Carolina communities but also sell furniture over the phone and by mail. Indeed, the Discounters say the majority of their sales are now made by telephone or by mail to out-of-state customers. Because they sell their products at thirty to forty percent below the manufacturer's suggested retail price, the Discounters contend their activities have stimulated price competition in many local furniture markets.

The Discounters claim the disputed Thomasville policies were designed with "the obvious purpose of eliminating the North Carolina retailers' selling to out-of-state customers."[2] In May 1986 Thomasville prohibited retailers from advertising the sale of Thomasville furniture outside their "Area of Primary Responsibility." That fall Thomasville met with North Carolina retailers, including many Discounters, to discuss the new sales policy. The Discounters say they relied on assurances by Thomasville management that the corporation had no intentions of restricting telephone and mail sales. Thomasville counters that no one represented that the furniture maker would never change its distribution policy or expand its Gallery program into North Carolina. Thomasville subsequently prohibited its retailers from selling furniture to out-of-state customers not physically present in the store at the time of sale. Thomasville also extended the Gallery Program into North Carolina. The Discounters claim that the gallery requirements imposed in their state were more onerous than those instituted elsewhere.

The Discounters brought this action in June 1988, claiming the Thomasville policies constitute (1) conspiracies which unreasonably restrain trade in violation of Sherman Act § 1, 15 U.S.C. § 1, and N.C.Gen. Stat. §§ 75–1 and 75–1.1; (2) conspiracies and attempts to monopolize in violation of Sherman Act § 2, 15 U.S.C. § 2; and (3) unfair and deceptive trade practices and unfair methods of competition in violation of N.C.Gen.Stat. § 75–1.1. The Discounters demanded an injunction that would both temporarily and permanently restrain Thomasville from enforcing against them the brochure ban, physical presence restriction, and gallery program. After considering affidavits and briefs, and hearing oral argument, the district court denied the Discounters' motion for preliminary injunction. The court subsequently dismissed the Sherman Act § 2 and N.C.Gen.Stat. § 75–1 claims, and denied the Discounters leave to

2. The Discounters suggest this was part of a general effort by furniture manufacturer-suppliers, including the Drexel Heritage, Century, Hickory Chair, Hickory Manufacturing, Harden, Pennsylvania House, and Bernhardt brands, as well as Thomasville. However, the theory on which the Discounters relied in seeking preliminary injunctive relief and in this appeal is that Thomasville's activities constituted a *vertical* restraint of trade.

amend their complaint,[3] but made the necessary findings to permit interlocutory appeal pursuant to Fed.R.Civ.P. 54(b) and 28 U.S.C. § 1292(b). The Discounters appeal the denial of the preliminary injunction, the dismissals,[4] and the refusal to allow amendment of their complaint.

## II. Preliminary Injunction

A preliminary injunction is, of course, "an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Federal Leasing v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981). The district court found that the Discounters had not established a clear entitlement to relief. We may reverse only if an abuse of discretion is shown, and we find no such abuse. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048, 1055 (4th Cir.1985).

The district court analyzed the Discounters' motion under the four-part standard of *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir.1977), which is essentially a balance-of-hardships test. The probable irreparable harm to the plaintiff in the absence of an injunction is weighed against the likely injury to the defendant if the injunction is granted. In judging where the balance falls, the court gauges the prospective merits of the plaintiff's case and considers the public interest in the controversy. Here, the district court found minimal harm to the Discounters and significant potential harm to Thomasville. The court also concluded that the Discounters' case "c[a]me up short" on the merits, and that issuance of the injunction would not promote the public interest.

*Balance of Harms*

The district court reasoned:

[I]t appears that plaintiffs' sales of Thomasville furniture constituted only about seventeen percent of their total sales, and an even smaller percentage of sales of Thomasville products are made to out-of-state customers. The contention of plaintiffs that their businesses have been seriously threatened by the implementation of Thomasville's sales policies is not convincing.

The court concluded that any financial harm accruing to the Discounters during this litigation could be compensated by actual and treble damages if they succeed on the merits. It was unimpressed by the Discounters' claims that they face irreparable injury from the loss of customer goodwill.

The Discounters urge that the district court misconstrued the nature of the harm imposed on them by Thomasville's action, stressing that they cannot be adequately compensated by fixed damages. They take particular issue with the court's treatment of their goodwill argument, contending that they are being forced to turn away prospective telephone customers, and that the Thomasville sales policies are causing "the emasculation of the North Carolina Discounters in the minds of the consuming public...." They argue that, if Thomasville's sales policies are ultimately held illegal, it will take years to restore the confidence of the buying public and to reeducate consumers to the presence of the Discounters in the marketplace.

We agree with the district court, however, that any potential damage to the Discounters' customer goodwill is limited. The new Thomasville marketing strategy does not impair the Discounters' ability to sell Thomasville furnishings to local consumers or to out-of-state customers who come to their showrooms. The appellants have not been prevented from filling standing orders,[5] as was the plaintiff in *Blackwelder,* 550 F.2d at 197. Neither are they struggling "to preserve [their] existence

---

**3.** The Discounters moved the court to amend its dismissal order to grant leave to amend, pursuant to Fed.R.Civ.P. 59(e). They subsequently filed a Fed.R.Civ.P. 15(a) motion to amend. The court denied their 59(e) motion, thereby effectively denying their 15(a) motion as well.

**4.** The Discounters do not challenge the district court's dismissal of an additional cause of action based on a theory of fiduciary relationship.

**5.** The Thomasville policy changes were announced several months before their implementation.

and [their] business," as was the plaintiff in *Federal Leasing*, 650 F.2d at 500 (citing *Semmes Motors v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (Friendly, J.)). See also *Modern Computer Systems v. Modern Banking Systems*, 871 F.2d 734, 738 (8th Cir.1989), where the Eighth Circuit recently held that a plaintiff's potential loss of nearly a fourth of its customers did not constitute irreparable damage to goodwill sufficient to warrant injunctive relief. Here, Thomasville products constitute only seventeen percent of the Discounters' *total* sales, and only a fraction of their Thomasville sales are affected by the disputed policies. We simply cannot disagree with the district court's finding that, if it is determined the Discounters have been injured by illegal acts, they can be made whole by a calculable measure of damages.

On the other side of the balance, the district court concluded that the specter of an injunction posed a significant threat to Thomasville:

> The plaintiffs themselves have pointed to a rapid increase in Thomasville's profits since it instituted its gallery program, and Thomasville is justifiably concerned that expansion of its gallery program will be seriously impeded if the plaintiffs are relieved of any restrictions on mail order and telephone sales.

The Discounters argue, however, that Thomasville's gallery program is moving ahead under its own momentum, and would not be impeded by the injunctive relief they are requesting—contending that the record provides inadequate evidentiary support for the district court's analysis. While we agree that more extensive findings on this issue would have been helpful, we think there is support in the record to sustain the district court's conclusion. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir.1989).

*Likelihood of Success*

In *Blackwelder* we stressed, "The decision to grant or deny a preliminary injunction depends upon a 'flexible interplay' among all the factors considered." 550 F.2d at 196. Because of this flexible interplay, we have explained that a strong showing by the plaintiff on one aspect of the test can compensate for a weak showing on another:

> There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.

*North Carolina State Ports Auth. v. Dart Containerline Co.*, 592 F.2d 749, 750 (4th Cir.1979); *see also Quince Orchard*, 872 F.2d at 79; *Blackwelder*, 550 F.2d at 196. Here, the Discounters have not prevailed on the balance of harms; therefore, a strong showing of probable success on the merits was essential to their argument for injunctive relief. The district court concluded, and we agree, that the Discounters failed to make this showing.[6]

*Sherman Act § 1.* The Supreme Court has explained that vertical nonprice restraints, such as the ones at issue here, are subject to rule of reason analysis, under which "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[7] *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (footnote omitted); *see also Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 108 S.Ct.

---

6. Our analysis, of course, is based on the record as it stands at this early stage of litigation. We express no opinion on the ultimate decision on the Sherman Act § 1 or N.C.Gen.Stat. § 75-1.1 claims.

7. One of the circumstances may be the possible procompetitive effects of vertical nonprice restraints on interbrand competition, and the Supreme Court has described interbrand competition as "the primary concern of the antitrust laws." *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 1521, 99 L.Ed.2d 808 (1988). *See generally Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 54-56, 97 S.Ct. 2549, 2559-61, 53 L.Ed.2d 568 (1977).

1515, 1519–20, 99 L.Ed.2d 808 (1988). "A threshold inquiry in any Rule of Reason case is whether the defendant had market power...."[8] *Valley Liquors v. Renfield Importers,* 822 F.2d 656, 666 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987); *accord Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750, 761 (D.Md.1980), *aff'd,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *cf. Military Serv. Realty v. Realty Consultants,* 823 F.2d 829, 832 (4th Cir.1987). To prove market power, the plaintiff must first establish the relevant product and geographic markets. *Satellite Television & Associated Resources v. Continental Cablevision,* 714 F.2d 351, 355 (4th Cir. 1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984).

The Discounters contend the appropriate product market consists of "name brand" or "better branded" furniture—the "high quality, highly-differentiated furniture products of a relatively few manufacturers." They point to an economist's unsupported assertion that the market is better branded furniture. The Discounters also present a Thomasville analysis of the St. Louis furniture market, in which only a handful of furniture lines were listed as competing *galleries.* Thomasville responds that its furniture prices cover a significant range, that it competes with two thousand manufacturers of wood furniture and two thousand manufacturers of upholstered furniture, and that some Discounters have placed classified advertisements stating that they carry 250 or 300 major lines.

The argument which the Discounters attempt—that quality, price, and reputation determine the relevant product market—is difficult to maintain. This is so because the relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962) (footnote omitted); *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956). The definition presumes that consumers are willing to make tradeoffs on some of the very factors the Discounters attempt to use to define their market. "Courts have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences." *In re Super Premium Ice Cream Distrib. Antitrust Litig.,* 691 F.Supp. 1262, 1268 (N.D.Cal.1988).[9] The Discounters have not met their burden of establishing that "better branded" furniture is not interchangeable with other furniture lines. We therefore conclude that they have not defined a relevant product market, let alone established that Thomasville had market power.

For that matter, they have not identified a relevant geographic market. The Discounters contend the relevant geographic market is actually a series of discrete local markets. They argue that Thomasville conducts research on the basis of 276 Sales and Marketing Statistical Areas (SMSAs). The Discounters claim the Thomasville sales policies in dispute will give the manufacturer market power in some of these SMSAs. Like the Supreme Court in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 331, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961), "We do not believe that the [geographical] pie will slice so thinly." *See*

---

**8.** Market power is the ability to raise prices above the levels that would be charged in a competitive market. *NCAA v. Board of Regents,* 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 2964 n. 38, 82 L.Ed.2d 70 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 1566 n. 46, 80 L.Ed.2d 2 (1984). For a discussion of market power in vertical nonprice restraint cases, see *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 315–17 (8th Cir. 1986).

**9.** *Compare Brown Shoe,* 370 U.S. at 326, 82 S.Ct. at 1524, *and Beatrice Foods Co. v. FTC,* 540 F.2d 303, 309–10 (7th Cir.1976), *with Avnet, Inc. v. FTC,* 511 F.2d 70, 77–79 (7th Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975), *and A.G. Spalding & Bros., Inc. v. FTC,* 301 F.2d 585, 591–603 (3d Cir.1962).

*also Consul. Ltd. v. Transco Energy Co.,* 805 F.2d 490, 495 (4th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987); *Satellite Television,* 714 F.2d at 356–58. Thomasville argues persuasively that the relevant geographic market is national and that Thomasville cannot have market power because it sells less than three percent of the wood furniture and one percent of the upholstered furniture manufactured in that market. Agreeing, we note:

> Firms lacking market power, if they wish to survive, cannot adopt restraints that have anticompetitive effects. Thus such firms cannot have an effect on interbrand competition. Consequently, a finding of no market power precludes any need to further balance the competitive effects of a challenged restraint.

*Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 316 (8th Cir.1986) (footnote omitted). It follows that the Discounters have not established the likelihood that they can prove Thomasville's actions had an adverse effect on competition under a rule of reason analysis, and therefore have not demonstrated the strong probability of success on the merits necessary to support the injunctive relief they seek.

*N.C.Gen.Stat. § 75–1.1.* The Discounters argue that they have a stronger likelihood of success under their state law claim because § 75–1.1 prohibits unfair trade practices outside the orbit of the Sherman Act.[10] *See L.C. Williams Oil Co. v. Exxon Corp.,* 625 F.Supp. 477, 488 n. 10 (M.D.N.C. 1985). They contend that in an October 1986 meeting Thomasville executives encouraged the Discounters' telephone and mail selling efforts and promised there would never be galleries in North Carolina. The Discounters claim Thomasville then instituted a turnabout in policy, which they characterize as deception and unfairness violative of § 75–1.1. Thomasville executives, however, deny they made any promises concerning future distribution policies. Here again, on the record before us, we cannot conclude that the Discounters made the strong showing of probable success on the merits necessary to support their argument for injunctive relief.

*Public Interest*

Finally, we agree with the district court that, "[w]hile the public always has an interest in the enforcement of the antitrust laws," the evidence presented at this stage of the litigation did not indicate the public interest supported entry of an injunction.

### III. Dismissal of Claims

The Discounters also appeal the district court's 12(b)(6) dismissal of their claims under Sherman Act § 2 and N.C.Gen.Stat. § 75–1, and denial of leave to amend their complaint.

*Sherman Act § 2.* The Supreme Court has adopted a rigorous standard on dismissals in antitrust cases:

> We have held that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. And in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

*Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) (citations omitted). While we can understand the trial court's frustration with the "unprecedented prolixity" of the Discounters' forty-page complaint, we cannot conclude that the complaint was hopeless beyond repair. The Discounters have failed to allege specific intent, a vital element of either a conspiracy or an attempt to monopolize claim. *White Bag Co. v. International Paper Co.,* 579 F.2d 1384, 1387 (4th Cir.1974). However, they seek an opportunity to cure that defect by amendment, and we think the district court abused its discretion in

---

10. The Discounters also suggest that the arguments put forward in their Sherman Act § 1 claim establish an action under § 75–1.1. *See ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 48 (4th Cir.1983), *aff'd on rehearing,* 742 F.2d 170 (4th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). This theory is disposed of by the analysis above.

denying leave to amend without explanation. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

*N.C.Gen.Stat. § 75–1.* The dismissal of the Discounters' claim under N.C.Gen.Stat. § 75–1 poses a closer question.[11] The statute tracks the language of the Sherman Act § 1, and the North Carolina Supreme Court has described the Sherman Act as "instructive in determining the full reach" of § 75–1. *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521, 530 (1973); *see also Hester v. Martindale–Hubbell, Inc.*, 493 F.Supp. 335 (E.D.N.C.1980), *aff'd*, 659 F.2d 433 (4th Cir.1981), *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982). The district court dismissed the state claim as duplicative. The Discounters argue that the state and Sherman Act claims can be distinguished because § 75–1 does not require an effect on interstate commerce. This might be a critical distinction in another case, but impact on interstate commerce has not been disputed here. Therefore, we affirm the dismissal of this cause of action.

### Conclusion

In conclusion, we affirm the denial of the Discounters' motion for a preliminary injunction and the dismissal of their claims under Sherman Act § 2 and N.C.Gen.Stat. § 75–1. However, we remand to allow the appellants an opportunity to amend their complaint to cure pleading deficiencies relating to their Sherman Act § 2 claim.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART, WITH INSTRUCTIONS.

---

11. The Discounters raised two state law claims, N.C.Gen.Stat. 75–1, and N.C.Gen.Stat. 75–1.1. They appeal the dismissal of their § 75–1 claim. Section 75–1 provides in part:

   Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal.

The district court denied a motion to dismiss the § 75–1.1 claim, but did not address § 75–1.1 in denying the Discounters' motion for a preliminary injunction. Section 75–1.1 states in part:

   Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.