MOOREFORCE, INC., Samuel Blake Stout and wife, Kathy Neel Stout, Clinton G. Peele and wife, Kay Keith Peele, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, Norman Y. Mineta, Secretary, United States Department of Transportation, Federal Highway Administration, Mary E. Peters, Administrator, Federal Highway Administration, Nicholas L. Graf, Division Administrator, Federal Highway Administration, North Carolina Division Office, North Carolina Department of Transportation, Lyndo Tippett, Secretary, North Carolina Department of Transportation, Defendants.

No. 1:02–CV–00218.

United States District Court, M.D. North Carolina.

Feb. 4, 2003.

428

STEPHEN SCOTT SCHMIDLY, MOS-ER SCHMIDLY MASON & ROOSE, ASHEBORO, NC, for Plaintiff.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, Pamela S. West, U.S. Dept. oOf Justice Environment & Natural Res. Division, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter comes before the Court on a Motion for Preliminary Injunction [Document # 36] by Plaintiffs MooreFORCE, Inc. ("MooreFORCE"), Samuel Blake Stout and his wife Kathy Neel Stout ("Mr. and Mrs. Stout"), and Clinton G. Peele and his wife Kay Keith Peele ("Mr. and Mrs. Peele"), (collectively "Plaintiffs"), to prevent Defendants United States Department of Transportation ("USDOT"), Norman Mineta, as Secretary of the United States Department of Transportation, the Federal Highway Administration ("FHWA"), Mary E. Peters as Administrator of the Federal Highway Administration, Nicholas L. Graf, as Division Administrator of the North Carolina Division Office of the Federal Highway Administration, (collectively "Federal Defendants"), the North Carolina Department of Transportation ("NCDOT"), and Lyndo Tippett, as Secretary of the North Carolina Department of Transportation, (collectively "State Defendants"), (all State and Federal Defendants are collectively "Defendants"), from taking any irrevocable actions related to the construction of the U.S. Highway 1 Bypass of Vass and Cameron in Moore and Lee Counties, North Carolina. For the reasons that follow, Plaintiffs' Motion is DENIED.

## II. FACTUAL BACKGROUND

In 1989, the North Carolina Legislature enacted the Highway Trust Fund Act, which established a fund for the expansion of U.S. Highway 1 ("US1") to four lanes from Henderson, North Carolina near the North Carolina–Virginia state line south to the South Carolina state line, among other projects. The challenged project in this case, known as NCDOT TIP Project No. R–210 ("R–210"), is the proposed construction of a 12.4 miles segment of the US1 Bypass ("Bypass") that spans Lee and Moore Counties, North Carolina. Plaintiffs Mr. and Mrs. Stout and Mr. and Mrs. Peele own land along the 12.4 mile segment that NCDOT has condemned for the proposed Bypass. (First Am. Compl. ¶¶ 6–7.) Plaintiff MooreFORCE is a not-for-profit corporation dedicated to promoting "a sound environment through public involvement and public education." (*Id.* at ¶ 8.) Its thirty-five members reside in and use the areas that will be affected by the construction of the proposed Bypass. (*Id.* at ¶ 9.)

On September 11, 1991, NCDOT and FHWA released a Draft Environmental Impact Statement ("DEIS") that, among other subjects, detailed the transportation demand, eight proposed alternatives, affected environment, and environmental consequences of R–210.[1] (Pls'.Ex. DD.) Defendants then requested public comments and held public hearings on November 12 and 19, 1991, to provide community members with a forum in which to present their concerns regarding topics addressed in the DEIS. (Pls.' Ex. 2.) At the public hearings, administrators listened to the concerns of local residents, including Plaintiffs' counsel in this action, Marsh Smith, and agreed to extend the public comment period from two weeks to thirty days. (Pls.' Ex. 2 at 4.) Ultimately, Defendants selected the route deemed "Alternative A" in the DEIS as the preferred route because it had the least environmental impact and it was the least controversial.[2] (Pls.' Ex. FF at TA-

---

1. NCDOT intends to construct R–210 with funds from the North Carolina Highway Trust. To date, NCDOT has not requested federal funding for the construction of R–210.

2. Many individuals supported Alternative A as the preferred route because it "uses portions of existing U.S. 1 corridor and bypasses [the

BLE S–1, S–10.) NCDOT prepared a Final Environmental Impact Statement ("FEIS"), which Defendants made available for public comment on December 1, 1995. (Pls.' Ex. FF at S–10.) After its review of the comments, on March 26, 1996, the Raleigh Division Office of the FHWA issued its Record of Decision ("ROD") which indicated that Defendants chose Alternative A for the alignment of the project. (Defs.' Ex. A.) Issuance of the ROD represented final agency action and completed the NEPA process.

After Defendants issued the ROD, NCDOT began further preparations for the construction of R–210. Among the final preparations, NCDOT determined that it would require a Clean Water Act Section 404 Permit from the Army Corps of Engineers ("ACE") because of the unavoidable impacts that R–210 will have on wetlands. One part of the Section 404 permit process required NCDOT to obtain a Section 401 Water Quality Certification from the North Carolina Department of Environment and Natural Resources ("NCDENR"), which it received on July 19, 2002. (State Defs.' Br. in Opp'n to Pls.' Mot. for Prelim. Inj. at 3.) Receipt of the Section 401 Certification permitted the ACE to issue a Clean Water Act Section 404 Permit on October 4, 2002. (Defs.' Ex. I.)

Plaintiffs filed their Complaint [Document # 1] against Defendants on March 20, 2002, almost six years after the ROD was signed, asserting claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d, and the North Carolina Environmental Policy Act ("NCEPA"), N.C. Gen.Stat. §§ 113A–1–113A–13, challenging the adequacy of the FEIS in connection with the proposed construction of the US1 Bypass around the towns of Vass and Cameron in Moore and Lee Counties, North Carolina.[3] Specifically, Plaintiffs allege that Defendants should now be enjoined from proceeding with the proposed construction for the following reasons: Defendants relied on an insufficient site specific environmental impact statement[4] ("EIS"); they are required to conduct both a supplemental EIS ("SEIS") and a programmatic environmental impact statement ("PEIS"); they failed to analyze the cumulative impacts of the project; and they acted in bad faith. Plaintiffs request declaratory and injunctive relief with an order directing Defendants to prepare an SEIS and/or PEIS. (First Am. Compl. ¶¶ 22–38.)

On September 30, 2002, NCDOT opened bids for R–210, and the following day, the Bid Review Committee recommended that NCDOT award the contract to the low bidder. (Barbour Aff., Defs.' Ex. C, ¶ 6.) In anticipation of the imminent beginning of construction on the Bypass, on October 2, 2002, Plaintiffs sought a temporary restraining order ("TRO") to prevent NCDOT from awarding the contract to the low bidder. (Pls.' Mot. for T.R.O.) On October 4, 2002, this Court held a hearing during which it indicated

---

town of] Cameron well east of the school and town center." (Pls.' Ex. FF at S–10.)

3. Plaintiffs filed their First Amended Complaint [Document # 24] on September 23, 2002.

4. An environmental impact statement ("EIS") is a detailed written statement required by Section 102(2)(C) of NEPA. Its purpose is to serve as an action-forcing device to insure

that the policies and goals defined in NEPA "are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. It must provide a "full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

that it was denying the TRO, and requested the submission of additional information by the parties in anticipation of the Motion for Preliminary Injunction.[5] Plaintiffs ultimately filed the instant Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure on October 29, 2002, which is now before the Court. Defendants likewise have filed responses to Plaintiffs' Motion for Preliminary Injunction.

## III. DISCUSSION

### A. Standards of Review

#### 1. Preliminary Injunction Standards

■■ A preliminary injunction is "an extraordinary remedy... to be applied only in the limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991). In determining whether to grant or deny a preliminary injunction, the Court must consider four factors: (1) the plaintiff's likelihood of success on the merits of the underlying dispute; (2) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (3) the likelihood of harm to the defendant if the injunction is issued; and (4) the public interest. *Quince Orchard Valley Citizens Ass'n, Inc., v. Hodel*, 872 F.2d 75, 78–79 (4th Cir.1989) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977)). The plaintiff has the burden of proving "by a clear showing" that these factors support a decision to issue a preliminary injunction against the defendant. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *Direx*, 952 F.2d at 812.

■■ The most important factors are the potential harm to the plaintiff and the potential harm to the defendant. *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir.1994). The required irreparable harm "must be neither remote nor speculative, but actual and imminent." *Direx*, 952 F.2d at 812. If the plaintiff succeeds in making a clear showing that irreparable harm will result without injunctive relief, the Court must then balance the likelihood of that harm against the likelihood of harm to the defendant if the injunction is granted. *Id.* If the balance "tips decidedly in favor of the plaintiff," a preliminary injunction will be granted if the plaintiff raises substantial questions as to the merits of the underlying case. *Id.*

■ Hence, there is a correlation between the likelihood of the plaintiff's success on the merits and the probability of irreparable harm to the plaintiff. "If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction." *North Carolina State Ports Authority v. Dart Containerline Co., Ltd.*, 592 F.2d 749, 750 (4th Cir.1979). In other words, the plaintiff has to raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Rum Creek Coal Sales, Inc., v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991) (*quoting Blackwelder*, 550 F.2d at 195). The Court will consider each of the factors stated above in turn.

#### 2. The NEPA and NCEPA Frameworks and Standard of Review for the Likelihood of Success on the Merits

■ NEPA does not impose any substantive requirements on federal agencies.

5. Although the Court announced in court that it was denying Plaintiffs' Motion for a Temporary Restraining Order, NCDOT has not yet awarded the contract to the low bidder.

Instead, NEPA is only a procedural mechanism that serves to ensure the agency "considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). NEPA does this by requiring preparation of an EIS for any major federal action that significantly affects the quality of the "human environment." 42 U.S.C. § 4332(2)(c). The "heart" of the EIS is the alternatives analysis, which "should present the environmental impacts of the proposal and the alternatives in comparative form." 40 C.F.R. § 1502.14. The regulations require the agency to "evaluate all reasonable alternatives" and discuss the reasons for the elimination of alternatives from the study, as well as mitigation efforts related to each alternative. 40 C.F.R. §§ 1502.14(a), (f). The agency is then required to describe the affected environment in sufficient detail "to understand the effects of the alternatives." 40 C.F.R. § 1502.15. Finally, the regulations require the agency to conduct a detailed examination of the environmental consequences on the affected environment, including direct and indirect effects and their significance, the environmental effects of alternatives, and mitigation measures to the extent they were not covered under the alternatives analysis. 40 C.F.R. § 1502.16.

█ The Supreme Court has held that the NEPA process does not mandate a particular outcome, but rather describes the process necessary to reach an informed decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–51, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989). In fact, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* at 350, 109 S.Ct. at 1846. In other words, the agency may take the most environmental costly course of action, so long as the environmental impact is identified in the EIS and the agency determines that "other values" outweigh the impact on the environment. Moreover, the NEPA regulations clearly anticipate that an agency will have a preferred alternative, perhaps even a specific proposal, going into the EIS process. *See* 40 C.F.R. § 1502.2(g) (stating that an EIS "serve[s] as the means of assessing the environmental impact of *proposed* agency actions, rather than justifying decisions already made") (emphasis added); 40 C.F.R. § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.").

An agency's decision may be based on "factors including economic and technical considerations and agency statutory missions," as well as "any essential considerations of national policy which were balanced by the agency." 40 C.F.R. § 1505.2(b). The agency must also evaluate "reasonably foreseeable significant adverse effects on the human environment," which are known as the cumulative impacts. 40 C.F.R. §§ 1502.22 and 1508.7 (latter section defining cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency... or person undertakes such other actions.").

█ The standard for judicial review of the Plaintiffs' likelihood of success on the merits of the underlying lawsuit, the third element of the *Blackwelder* standard, is whether the agencies' decisions, in view of the FEIS, were arbitrary and capricious, an abuse of discretion, or not in accordance with the law. *James City County v. EPA,* 12 F.3d 1330, 1338 n. 4

(4th Cir.1993), *cert. denied,* 513 U.S. 823, 115 S.Ct. 87, 130 L.Ed.2d 39 (1994). The scope of review is narrow and the court only looks to see if there has been a "clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). An agency's rule would be arbitrary and capricious if the agency relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). The Fourth Circuit has also emphasized the Supreme Court's admonition that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Moreover, the Court is not empowered to substitute its judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). Consequently, the question before the Court regarding the Plaintiffs' likelihood of success on the merits of their underlying claim is whether the decisions of the administrative agencies were "arbitrary and capricious," and not whether Plaintiffs rightfully disagree with the statements contained in the administrative record and the final outcome.

■ In addition to the claims filed pursuant to NEPA, Plaintiffs also bring suit against Defendants under NCEPA. The North Carolina Court of Appeals has stated, however, that "to the extent that the federal environmental law is relied upon to meet the requirements of NCEPA, the federal requirements are by reference enforceable against North Carolina agencies as state law." *North Carolina Alliance for Transp. Reform, Inc. v. United States Dep't of Transp.,* 151 F.Supp.2d 661, 678 n. 16 (M.D.N.C.2001) (*quoting Orange County v. North Carolina Dep't of Transp.,* 46 N.C.App. 350, 368, 265 S.E.2d 890, 903 (1980)). For this reason, in determining whether Defendants were substantially justified in preparing the FEIS, the Court will consider NEPA's implementing regulations. Furthermore, for simplicity of language, the Court will refer primarily to NEPA rather than to both NEPA and NCEPA when discussing the adequacy of the FEIS.

### B. Balance of Hardships

■ Plaintiffs argue that as a result of Defendants' imminent awarding of the contract to construct the US1 Bypass and its eventual ground-breaking, they will suffer irreparable harm because the Bypass will permanently alter the property upon which it will be constructed, and the Bypass will "significantly affect the natural, environmental, cultural, and historical qualities of Moore and Lee County [sic]." (Pls.' Mem. in Supp. of Mot. for T.R.O. at 8.) Plaintiffs also argue that once Defendants begin construction of the Bypass, Defendants will become more committed to building the entire route[6] which will further entrench

---

**6.** As will be discussed, Plaintiffs contend that Defendants should have examined the cumulative impacts of R–210 and four other proposed segments of US1 which total approximately eighty miles of highway throughout Moore, Lee, and Richmond Counties. Plaintiffs view the beginning of construction of the US1 Bypass as the initial event which will commit NCDOT to construct the entire eighty miles stretch that Plaintiffs ultimately hope to force Defendants to reexamine as a result of their underlying lawsuit.

them in the decisions Plaintiffs allege Defendants made in violation of NEPA.[7]

■ If Plaintiffs can demonstrate irreparable harm to the environment that was not considered by Defendants, then injunctive relief is almost always warranted because of the inability of money damages to adequately remedy the harm, and the lengthy duration, if not permanence, of harm to the environment. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Moreover, many courts have held that irreparable harm is presumed when an agency fails to thoroughly evaluate the environmental impact of a proposed action. *See, e.g., Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984). Thus, it appears that the appropriate inquiry for the Court is to evaluate whether the agencies failed to thoroughly evaluate the environmental impacts of R–210, that is, to examine the merits of Plaintiffs' underlying cause of action.

Defendants, on the other hand, argue that they will suffer irreparable harm if the preliminary injunction is granted because any delay in the construction of the Bypass will lead to automobile accidents that could have been prevented had the Bypass been completed sooner. Hence, Defendants contend that the inability to increase public safety by constructing the Bypass, and the injuries and deaths that result in the interim, are the irreparable harms they will suffer if the Court grants the preliminary injunction. In response to Defendants' assertions, Plaintiffs point out that NCDOT waited more than six years after it signed the FEIS to begin the Section 404 permit process by applying for the Section 401 Water Quality Certification, which Defendants knew was required before they could begin construction. Plaintiffs contend that if Defendants were truly concerned about public safety, then they should have taken steps in the interim to mitigate the dangers to the public of the segments of US1 currently in existence.

■ However, the Court notes that the same timeliness argument advanced by the Plaintiffs in their attempt to diffuse the Defendants' position is applicable to the Plaintiffs own situation with regard to the length of time the Plaintiffs waited to bring a lawsuit, and subsequently file a Motion for Preliminary Injunction against Defendants. Plaintiff Moore FORCE, and Plaintiffs' counsel, Marsh Smith, had knowledge of the FEIS and ROD, and knew they had a legal right to challenge the FEIS prior to April 12, 1996.[8] (Pls.'

---

7. Plaintiffs cite *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir. 1972), in support of the proposition that Plaintiffs will suffer irreparable harm caused by Defendants proceeding with the proposed Bypass because Defendants will become more committed to that particular route. The Court finds, however, that the facts of *Arlington* differ from those in the instant matter because *Arlington* occurred in response to the enactment of NEPA. In *Arlington,* the plaintiffs sued the defendants to enjoin them from continuing construction on Interstate 66 after NEPA's provisions became effective. *Id.* at 1327. In other words, the plaintiffs wanted the defendants to conduct an initial EIS after the construction began because of the enactment of NEPA. In the instant matter, Defendants have already conducted an FEIS, and

Plaintiffs are attempting to halt the groundbreaking because they are not satisfied with the analysis in which NCDOT and FHWA have already engaged.

8. In a letter dated April 12, 1996, addressed to USDOT and NCDOT, Marsh Smith, as counsel for MooreFORCE, requested the withdrawal of the FEIS and ROD that are the subjects of the instant matter. In his nine-page letter, Smith details the alleged inadequacies of the FEIS and ROD, which are similar to Plaintiffs' claims in the lawsuit underlying the instant matter. As this letter demonstrates, Plaintiff MooreFORCE and Plaintiff's counsel Marsh Smith clearly had knowledge of the FEIS and ROD by April 12, 1996.

Ex. F.) Nonetheless, Plaintiffs filed their Complaint against Defendants challenging the sufficiency of the FEIS only six days before their statute of limitations, which began to run almost six years earlier when Defendants issued the ROD, expired.[9]

Indeed, any irreparable harm the Plaintiffs face could perhaps be considered a consequence of "their own procrastination." *Quince*, 872 F.2d at 79. This was true in *Quince* where the Fourth Circuit upheld the district court's denial of a preliminary injunction when the plaintiffs waited six months before they requested preliminary relief. The Fourth Circuit quoted the district court's unpublished opinion, which noted that:

> All the facts that the Plaintiffs needed to bring [an action for preliminary injunction] were known to them at least six months before they requested preliminary relief .... If Plaintiffs had proceeded with this action expeditiously when the record was complete six months ago, it would not have been necessary for Plaintiffs to make their present request for extraordinary injunctive relief .... Thus, the Plaintiffs could have received a trial on the merits long before the awarding of the construction contract.

*Id.* The Fourth Circuit then found that because the district court could have resolved the dispute on its merits in the nine months after the FEIS approval was issued, the court was justified in concluding

that much of the plaintiffs' potential harm was a product of their own delay in pursuing the preliminary injunction. *Id.*

Similarly, in the instant matter, the Court finds that Plaintiffs' delay in filing the preliminary injunction after they waited for more than six years after Defendants issued the ROD cannot support the conclusion that the irreparable harms faced by Plaintiffs significantly outweigh those that Defendants will suffer. Plaintiffs cannot even maintain an argument that they were waiting until Defendants completed the permit process before they brought a Motion for Temporary Restraining Order because Plaintiffs brought their motion on October 2, 2002, two days before Defendants received the final Clean Water Act Section 404 Permit which they were required to have in order to start construction on the Bypass. In other words, Plaintiffs, some of whom were involved in the NEPA process from 1991 and were aware of the issuance of the FEIS in 1995, waited until the last possible moment before they requested intervention from the Court. Consequently, the Court finds that much of Plaintiffs' potential harm is a product of their own delay in pursuing a preliminary injunction. The Court finds therefore in analyzing the balance of harms that Plaintiffs only face slightly more harm than Defendants due to the nature of environmental harm in general, instead of the balance weighing more heavily in favor of

---

9. The Administrative Procedure Act ("APA"), the statute under which Plaintiffs must bring their claims since NEPA does not provide a private right of action, does not include its own statute of limitations. The Fourth Circuit, however, has applied the general statute of limitations applicable to claims against the government, that is, Plaintiffs have six years from the time the right of action first accrues to bring suit against Defendants. *Jersey Heights Neighborhood Ass'n v. Glendening* 174 F.3d 180, 186 (4th Cir.1999) (applying 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"). In the instant matter, Plaintiffs' right of action under the APA accrued when the ROD was finalized on March 26, 1996. Plaintiffs eventually brought suit on March 20, 2002.

Plaintiffs had they requested injunctive relief sooner.

## C. Plaintiffs' Likelihood of Success on the Merits

Because the balance of harms only slightly favors Plaintiffs, but does not "tip[ ] decidedly" in their favor, Plaintiffs have a high burden to show that they are likely to prevail on the merits of their case. *Dart Containerline Co.*, 592 F.2d at 750. In support of their contention that they will likely prevail on the merits of their claim, Plaintiffs advance four arguments.[10] First, Plaintiffs contend that the FEIS conducted by Defendants violates NEPA and NCEPA because it is inadequate. Second, Plaintiffs contend that, in order to comply with NEPA and NCEPA, Defendants now need to conduct both an SEIS and a PEIS to evaluate new circumstances that have arisen and the effects of the entire highway project from Henderson, North Carolina, to the South Carolina state line. Third, Plaintiffs contend that Defendants violated the Council on Environmental Quality ("CEQ") Regulations because they failed to analyze the cumulative impacts of the eighty miles of highways projects that will occur in the "Sandhills" region of North Carolina, a geographic region which contains the stretch of highway at issue in this matter. Finally, Plaintiffs contend that State Defendants violated NCEPA by not preparing, executing, or sending a copy of the ROD to the State Clearinghouse for notice. The Court will address each of these arguments in turn.[11]

### 1. Inadequacy of FEIS

■ Plaintiffs contend that the FEIS is inadequate because it contains an erroneous cost-benefit analysis, relies upon misleading traffic data to project inflated traffic forecasts, and fails to adequately analyze the indirect effects of R–210. As already noted, for the Court to find that the FEIS is inadequate, Defendants must have made a "clear error in judgment" in order to satisfy the "arbitrary and capricious" standard when they relied on its data to select Alternative A as their choice for construction of the Bypass.

---

**10.** In addition to the four arguments discussed *infra,* Plaintiffs also seem to suggest that Defendants violated both the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1376, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. However, Plaintiffs' Complaint does not specifically reference the CWA nor the Army Corps of Engineers, the agency responsible for federal actions related to wetlands and mitigation for wetland impacts. Similarly, Plaintiffs' Complaint does not specifically reference the ESA nor the Fish and Wildlife Service, the agency responsible for federal protection of endangered or threatened species. The Court finds that these claims cannot be considered in this lawsuit because they have not been noticed or properly pled under the relevant sections of the CWA and the ESA.

**11.** The Court has decided this matter solely on the basis of Plaintiffs' Motion for Preliminary Injunction. However, particularly as it relates to the *Blackwelder* inquiry of likelihood of success on the merits, the Court notes that Plaintiffs may not be able to sustain their claims under NEPA against either the Federal or State Defendants because R–210 is a state project, and therefore, the requirements of NEPA are inapplicable to it. *See e.g., Dep't of Transp. v. Blue,* 147 N.C.App. 596, 556 S.E.2d 609 (2001). Moreover, Plaintiffs may not be able to maintain any NCEPA claims against Federal Defendants because Eleventh Amendment sovereign immunity acts as a bar to state law claims brought against the federal government in the absence of an unequivocal waiver of sovereign immunity. *See e.g., FDIC v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Defendants raise these arguments with respect to Plaintiffs' likelihood of success on the merits, however a thorough discussion of these issues was not necessary to resolve the only matter before the Court, that is, Plaintiffs' Motion for Preliminary Injunction.

### a. Misleading Cost–Benefit Analysis

NEPA does not mandate the inclusion of a cost-benefit analysis in an environmental impact statement. *See* 40 C.F.R. § 1502.23 ("[W]hen a cost-benefit analysis is prepared, [an agency should] discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities."). Although not required, the FEIS for R–210 contained a cost-benefit analysis for the project. Plaintiffs allege that several inaccuracies with the values used in the cost-benefit analysis skewed the decision-making process.

As to particular errors in the cost-benefit analysis, Plaintiffs first contend that the analysis includes a calculation of benefits using grade separated interchanges at intersections, but calculates the cost of intersections as grade intersections, which are much less costly to construct. Plaintiffs also assert that Defendants did not consider costs such as added travel time and additional vehicle operating costs from induced traffic. Based upon these errors, Plaintiffs maintain that Defendants were unable to properly analyze the consequences of R–210.

In *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir.1996), the Fourth Circuit found an EIS to be in violation of NEPA because its cost-benefit analysis relied on inflated estimates of the proposed project's economic benefits. The *Hughes River* Court stated that due to "the potential for misleading economic assumptions to defeat the functions[12] of an EIS, we will engage in a 'narrowly focused' review of the economic assumptions underlying a project to determine whether the economic assumptions 'were so distorted as to impair fair consideration' of the project's adverse environmental effects." *Hughes River*, 81 F.3d at 446 (*quoting South Louisiana Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980)). However, several factors distinguish *Hughes River* from the present case. First, in *Hughes River*, the erroneous cost-benefit analysis inflated the projected economic benefit from the proposed action by thirty-two percent. The agencies responsible for preparing the FEIS in *Hughes River* mistakenly included gross economic benefit values rather than net values into their cost-benefit analysis, resulting in a much higher projected economic benefit. With respect to the alleged deficiencies in the cost-benefit analysis of R–210, even if the Defendants relied upon the wrong types of exchanges when calculating the costs and benefits and excluded the cost of induced travel from the analysis, there is no indication that the resulting miscalculation approaches the magnitude of error in *Hughes River*.[13]

Moreover, in calculating the cost-benefit analysis, Defendants conformed their analysis to the guidelines published by the American Association of State Highway and Transportation Officials, which are nationally accepted for highway project cost-effectiveness analyses. *North Car-*

---

**12.** The court defined these functions as (1) ensuring that an agency, when deciding whether to approve a project, will carefully consider, or take a "hard look" at, the project's environmental effects and (2) ensuring that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decision-making process and the implementation of the decision. *Hughes River*, 81 F.3d at 443.

**13.** Defendants also maintain that Plaintiffs misinterpreted the cost-benefit analysis because Defendants only used separation grade accesses from those intersections that exceeded a level-of-service C, as defined in the "Cost Effectiveness Technical Memorandum," as opposed to all of the intersections as Plaintiffs contend. (Defs.' Ex. Z at 14.)

*olina Alliance,* 151 F.Supp.2d at 693. Nonetheless, Plaintiffs contend that the cost-benefit analysis is inappropriate because Defendants failed to include the costs of "induced travel" [14]. The Court finds that the FEIS plainly contradicts Plaintiffs contention, and that Defendants did anticipate the cost of induced travel. The FEIS states that "the user-benefit analysis compares the estimated costs to put the project in place and maintain it . . . against the economic benefits which are expected to occur." (Pls.' Ex. FF at II–30.) The FEIS further identifies the costs to implement the project as engineering, right-of-way, and construction costs. (*Id.*) The costs to maintain the project include routine pavement patching, landscape maintenance, drainage clean-out, and other maintenance activities. (*Id.*) Consequently, the cost-benefit analysis examined the maintenance costs of the project as estimated based upon the all of traffic anticipated along the Bypass, including induced traffic. As a result, the Court finds that the agencies properly considered and relied upon the cost-benefit analysis when they selected Alternative A.

b. Misleading Traffic Data

Plaintiffs additionally argue that Defendants relied upon inflated projections of the average daily traffic volume ("ADT") at two locations along the current US1 corridor in Lee and Moore Counties. By relying upon these inflated projections, Plaintiffs contend that Defendants were biased against the no-build option, and were predisposed to select one of the build options. Moreover, Plaintiffs argue that the inflated traffic forecasts misled the public and decision-makers.

To support their contention that Defendants relied upon misleading traffic data to project inflated traffic forecasts, Plaintiffs rely on an affidavit by Robert Morris ("Morris Affidavit"), a retired traffic engineer, who they proffer as an expert witness. When a party offers expert testimony to a court, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The Fourth Circuit has noted that in order for a district court to properly exercise its gate-keeping function, it must make an inquiry which "focus[es] on the 'principles and methodology' employed by the expert, not the conclusions reached." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) (*quoting Daubert,* 509 U.S. at 594–95, 113 S.Ct. at 2797). After applying this standard, a court may exclude testimony from a qualified expert whose testimony is not sufficiently reliable because of invalid assumptions or lack of inquiry into the relevant facts. *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999).

Notwithstanding Morris' qualifications as an expert, the Morris Affidavit itself does not offer sufficient evidence that the agencies relied on faulty data or intentionally misled the public in their traffic forecasting numbers when they selected Alternative A. Specifically, Morris stated in his affidavit that he only considered the FEIS, and later testified in his deposition that he did not consider any other documents in the administrative record. (Morris Aff.

14. Induced travel is travel "that would not occur if the improvements were not made." (Morris Aff., Pls.' Ex. 3, ¶ 18.) In other words, it is additional traffic that is created because of the improvements in the road or highway. (*Id.* at ¶ 19.)

¶ 4; Morris Dep. at 100 ("I don't believe I saw the draft. I just saw the final [environmental impact statement].").) Morris also admitted that he was unfamiliar with the relevant area and the actual traffic numbers used in the NCDOT analysis, among other considerations. (Morris Dep. at 27, 43.) Finally, Morris relied solely upon materials provided to him by Plaintiffs' counsel and did not conduct an independent inquiry. (*Id.* at 43.) Morris stated that Plaintiffs' counsel provided him with some data regarding traffic volumes from NCDOT which he then compared to the data he found in the FEIS of R–210. (*Id.*) There was a discrepancy between the data, which Morris noted in his affidavit, however, he did not seek an explanation as to why the figures were different. (*Id.* at 44.) Instead, he interpreted the data he was provided by Plaintiffs' counsel, but did not conduct an independent inquiry. In response, Defendants proffer an affidavit by Wayne Davis, a Transportation Engineer Supervisor with NCDOT, stating that Morris' analysis was improper because a reliance solely on annual average daily traffic numbers does not consider actual data collection. Additionally, Defendants assert that they relied upon data from fourteen different points along US1, whereas Morris relied upon figures from only two points. Hence, Defendants contend that their analysis of traffic forecasting presents a more thorough and, consequently, reliable examination of traffic forecasting.

 The Court finds that the Morris Affidavit proffered by Plaintiffs only demonstrates a difference of opinion, and not a clear error in judgment by Defendants as Plaintiffs contend. "When there is conflicting expert opinion, it is for the administrative agency and not the courts to resolve the conflict." *Webb v. Gorsuch,* 699 F.2d 157, 160 (4th Cir.1983) (*citing Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1028 (4th Cir.

1975)). "[E]ven [if] the court would justifiably have made a different choice had the matter been before it *de novo,*" the court may not displace the agencies' choice between two conflicting views. *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (per curiam) (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). Consequently, the Court finds that the agencies properly relied upon their traffic forecasts, and did not mislead the public or decision-makers in violation of NEPA.

c. Failure to Analyze Indirect Effects

 An FEIS must address the indirect environmental impacts of a proposed action. 40 C.F.R. § 1502.16(b). Indirect effects include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). However, Defendants must consider only those indirect effects that are reasonably foreseeable. There is no need to consider potential effects that are highly speculative or indefinite. *Kleppe v. Sierra Club,* 427 U.S. 390, 402, 96 S.Ct. 2718, 2726, 49 L.Ed.2d 576 (1976).

Plaintiffs support their contention that Defendants inadequately addressed the indirect effects of R–210 by asserting that Defendants did not assess the "expected secondary and cumulative impacts of the proposed [Bypass] on fish and wildlife resources" as requested by the United States Fish and Wildlife Service ("USFWS"). (Pls.' Ex. FF at D–4.1, 4.2.) In a 1989 letter, the USFWS stated that its review of environmental documents related to R–210 would be greatly facilitated if the documents contained "[a]ssessments of the expected secondary and cumulative impacts" on fish and wildlife resources.

(*Id.*) However, in a subsequent letter in 1991, the USFWS did not raise any concerns regarding the discussion of secondary and cumulative impacts in the DEIS. (*Id.* at D–35.1.) Because the regulations only require that agencies respond in the FEIS to comments received regarding the DEIS, Defendants did not need to further address the initial concerns of the USFWS, which were not raised again in the 1991 letter. 40 C.F.R. §§ 1503.1(a)(1), 1503.4.

Moreover, Plaintiffs support their contention that the indirect effects analysis in the FEIS is insufficient by pointing out that R–210 is planned to have at least seven interchanges, including two major interchanges. Plaintiffs argue that the FEIS should have more fully analyzed the growth-inducing effects these interchanges would have because "a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors." *North Carolina Alliance*, 151 F.Supp.2d at 696 (*quoting City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir.1975)). Defendants counter that the FEIS adequately addressed the indirect environmental effects that would result from the construction of the Bypass. Specifically, Defendants discuss in the FEIS that the potential for growth includes increasing property values, new subdivisions near the major exchanges of the project, and possible commercial growth in the towns. (Pls.' Ex. FF at IV–4, IV–14, IV–16.) Furthermore, the FEIS acknowledges that growth may have environmental effects that will vary "depending upon the location, magnitude, and nature as well as the degree of planning for the added growth." (*Id.* at IV–91.) Because Defendants discussed the potential environmental effects that could result from prospective induced

growth in the FEIS, the Court finds that Defendants properly complied with NEPA and will not attempt to substitute its judgment for that of the agencies. Therefore, Plaintiffs' likelihood of success on the merits of their claim that the FEIS for R–210 is inadequate is not substantiated.

2. Failure to Analyze Cumulative Impacts

In addition to addressing the indirect environmental effects of a proposed action, an FEIS must consider the cumulative impacts of that action. 40 C.F.R. § 1508.25(c). Federal regulations define "cumulative impact" as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Plaintiffs argue that the FEIS fails to adequately discuss the cumulative impacts of R–210.

Specifically, Plaintiffs contend that Defendants improperly segmented R–210 out of a much larger project, extending approximately eighty miles, which included the four-laning of remaining sections of US1 that currently have less than four lanes throughout the Sandhills region, bypassing the existing US1 bypass of Southern Pines and Aberdeen, and four-laning Highway 24, which crosses US1 in the R–210 project area.[15] Plaintiffs contend that

15. Defendants have divided the approximate-

ly eighty miles span slated for expansion into

Defendants are required to conduct a cumulative impacts analysis because "[s]ignificance cannot be avoided by ... breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7). To guide agencies, regulations promulgated by the FHWA outline when segmentation of a project is permitted. Segmentation is permitted when a highway project: (1) connects logical termini and is of sufficient length to address environmental matters on a broad scope; (2) has independent utility or independent significance, or is usable and is a reasonable expenditure even if no additional transportation improvements are made in the area; and (3) does not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. 23 C.F.R. § 771.111(f). An examination of the proposed Bypass under these criteria would most likely demonstrate that segmentation for the project was proper because R–210 connects logical termini on US1, is 12.4 miles in length, has independent utility, and does not restrict consideration of alternatives.

In support of their contention that the cumulative impacts should have been examined, Plaintiffs cite a Ninth Circuit opinion which held that a single environmental impact statement should have been prepared for five related timber sales that were to occur within the same watershed. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1215 (9th Cir. 1998). The Ninth Circuit found that the sales were cumulative actions because they were part of a single project, were announced simultaneously, and were reasonably foreseeable. *Id.* Similarly, the Supreme Court has held that NEPA may require a comprehensive impact statement in certain situations where several proposed actions are concurrently pending before an agency if those proposals "will have cumulative or synergistic environmental impact[s] upon a region." *Kleppe,* 427 U.S. at 410, 96 S.Ct. at 2730.

However, these facts of these cases are quite different from the facts of the matter now before the Court. As Defendants argue, a proposal "exists at that stage in development of an action when an agency ... has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23. Projects that are not imminent are not considered proposals, and therefore, do not require an analysis of cumulative impacts. *Kleppe,* 427 U.S. at 410 n. 20, 96 S.Ct. at 2730. Defendants demonstrate that at the time the FEIS and ROD were issued for R–210, they had not yet completed any environmental review of the other segments of the much larger project which Plaintiffs contend should have been analyzed. Moreover, Defendants note that to date none of the other segments have even finished the environmental review process. Hence, in 1996, and still today, none of the projects cited by Plaintiffs are proposals, and thus could not be considered as pending concurrently with R–210 in 1996, for which a cumulative impacts analysis is required. Consequently, Plaintiffs' claim that Defendants failed to analyze the cumulative im-

---

five different segments. The projects include: (1) the 12.4 miles segment at issue in the instant matter known as R–210, which runs from Lee County to SR 1853 near Lakeview in Moore County; (2) a 15.2 miles segment running from the south terminus of R–210 to a point south of Aberdeen in Moore County; (3) an 8.3 miles segment running through Hoffman in Richmond County; (4) a 21.2 miles segment of Highway 24/27 running from the Carthage Bypass in Moore County to Highway 87 in Harnett County that intersects US1 near Cameron in Moore County; and (5) a 24.1 miles segment running from Marston Road (SR 1001) in Richmond County to the South Carolina state line.

pacts in violation of NEPA is unlikely to succeed on its merits.

### 3. Need for SEIS and/or PEIS

Plaintiffs contend that an SEIS or a PEIS is now required under NEPA because they contend that the FEIS is flawed. The Fourth Circuit has determined that "[n]ot every new circumstance requires a [SEIS]." *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990). The court stated, "[r]ather, the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Id.* (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987)). To meet this standard, Plaintiffs must demonstrate a "*seriously* different environmental impact" from that which was presented by Defendants in the FEIS for R–210.

Plaintiffs contend that Defendants use of misleading traffic data in the FEIS, the FEIS's misleading cost-benefit analysis, and the FEIS's failure to adequately analyze the indirect impacts of the proposed Bypass constitute the new circumstances that warrant an SEIS. As already discussed, Plaintiffs have not demonstrated any new circumstances that the agencies failed to consider nor have they presented any evidence to support their contention that Defendants failed to sufficiently analyze the direct or indirect impacts of R–210. In fact, the FEIS for R–210 acknowledges the potential for growth in the study area, the possible impacts from other new highways in the project area, and a comprehensive analysis of both the direct and indirect impacts of R–210. (Pls.' Ex. FF at IV–1–IV–93.) Simply put, Plaintiffs seek relief based upon affidavits by the Plaintiffs' experts which contest the opinion and conclusion reached by Defendants' experts. As the Supreme Court held, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861. Because the agencies' actions are entitled to deference by the court absent a clear error of the agencies' judgment, the Court finds that no new circumstances of sufficient magnitude exist to require Defendants to complete an SEIS.

Plaintiffs also maintain that a PEIS is required because the agencies were considering a large number of geographically and generically related actions. In *Kleppe v. Sierra Club*, the Supreme Court noted that a PEIS may be required under NEPA when several proposed actions are concurrently pending before an agency that "will have cumulative or synergistic environmental impact upon a region." 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). Plaintiffs assert that, because Defendants knew from the date of passage of the Highway Trust Fund Act in 1989 that NCDOT intended to widen US1, the projects were concurrently pending. However, in practice, because a PEIS is a general analysis, it typically serves as a means relied upon to identify projects where a more specific EIS will be necessary in the future. In other words, an agency drafts a PEIS to identify which projects will require an FEIS. *See, e.g., NRDC v. United States Nuclear Regulatory Comm.*, 606 F.2d 1261, 1270 (D.C.Cir. 1979) ("The programmatic EIS ... simply cannot provide *detailed* analysis of the important specific environmental issues involved.... [A PEIS] cannot replace the need for individual project EIS(s) when there are significant and important project-specific environmental issues."). Hence, at this stage of the environmental review process, Defendants could not accomplish the purpose of a PEIS because Defendants had already completed an FEIS for R–210. Therefore, the Court

finds that a PEIS was not required because Defendants had already conducted a site specific EIS, and consequently, Plaintiffs are unlikely to succeed on the merits of their claim that Defendants violate NEPA by not now preparing an SEIS or a PEIS.

### 4. Faulty ROD

█ Finally, Plaintiffs contend that they are entitled to a preliminary injunction because Defendants did not comply with the NCEPA notice provision for the filing of the ROD. Pursuant to Section 4(3) of NCEPA, the North Carolina Department of Administration promulgated regulations governing the procedures that agencies must follow when drafting and submitting the DEIS, FEIS, and ROD. Specifically, Section 25.0606(4) requires that "a copy of the record of decision [ ] be sent to the Clearinghouse to be sent to all review agencies, and a notice of its availability shall be published in the Environmental Bulletin." N.C. Admin. Code tit. 1, r. 25.0606. Plaintiffs find fault in the issuance of an FEIS here because the State Defendants never completed the process since any ROD it may have issued "did not go through the State Clearinghouse." (Pls.' Rep. Mem. to Defs.' Resp. to Pls.' Mot. for T.R.O. at 5.) Because the filing of the ROD did not follow the statutorily mandated procedures, Plaintiffs contend that "[i]t is as though NCDOT never made 'the final decision.' " (*Id.*)

In support of their contention as to the absence of notice of availability of the ROD, Plaintiffs refer to the affidavit of Chrys Baggett, the State Environmental Policy Act Coordinator. (Pls.' Ex. SS.) Baggett affirms that after searching the archives of the State Clearinghouse, he could locate a notice of the FEIS for R–210, but not the ROD. The electronic archives of the State Clearinghouse extend back to 1997, and prior to that, "archives of paper documents *recording notices published by the State Clearinghouse*" exist. (Pls.' Ex. SS) (emphasis added). While Plaintiffs contend that Baggett's affidavit means that the State Clearinghouse never received a copy of the ROD, the Court finds that it only establishes that a notice was received, but it may not have been published. In order to arrive at Plaintiffs' assertion that the lack of notice of the ROD indicates that the NCDOT did not make a final decision regarding R–210, Plaintiffs would have to provide compelling evidence to contradict NCDOT's obvious approval of R–210 as evidenced by its completion of the permit process after the issuance of the ROD and its desire to imminently award the contract and proceed with the construction of the proposed Bypass. However, even though the evidence is not clear that notice of a ROD was ever published, the Court still cannot find that Plaintiffs have demonstrated a likelihood of success on the merits of their claim that State Defendants violated NCEPA.

As already noted, NEPA achieves its purpose to ensure that agencies considered environmental concerns in their decision-making process by dictating procedures for the agencies to follow. In the instant matter, the Court finds that Plaintiffs did not demonstrate that Defendants contravened NEPA's purpose by violating the statutorily-mandated procedures, which do not dictate the agencies' substantive outcome. Consequently, Plaintiffs are not able to demonstrate that they are likely to succeed on the merits of any of the claims in their underlying lawsuit. Therefore, because the balance of irreparable harm to the Plaintiffs combined with the likelihood of success on the merits of their underlying lawsuit does not tip decidedly in their favor, Plaintiffs have failed to demonstrate that they are entitled to the injunctive relief they have sought in the form of a preliminary injunction.

## D. Consideration of the Public Interest

 For the sake of completeness, the Court will also address the public interest element of the *Blackwelder* test. The Court notes, however, that the public has substantial interests in both the protection of the environment as Plaintiffs contend as well as concerns for public safety as Defendants maintain. As the Fourth Circuit noted in *NRDC v. Watkins*, when it quoted the district court's opinion, "[t]he singular aspect of this case is that the parties' sharply differing views of the public interest are exactly what gave rise to [this] case." 954 F.2d 974, 983 (4th Cir.1992). However, since both parties demonstrate such important public interests, neither party can demonstrate a substantial enough advantage to tip the public interest in their favor. Moreover, in the face of the conflict of such important fundamental interests as environmental protection and public safety, determination of which concern is more central to the public interest is not an appropriate function for this Court. *Id.* at 984–85. Thus, the Court finds that the public interest in either granting or denying Plaintiffs' Motion for Preliminary Injunction does not sway the Court's analysis under *Blackwelder* in light of the Plaintiffs' inability to establish their likelihood of success on the merits.

## IV. CONCLUSION

For the foregoing reasons, this Court concludes that Plaintiffs have failed to sustain their burden of showing that each of the relevant factors—irreparable harm to Plaintiffs, harm to Defendants, Plaintiffs' likelihood of success on the merits, and the public interest—supports the Plaintiffs' request for a preliminary injunction based upon the facts of this case. Therefore, Plaintiffs' Motion for Preliminary Injunction [Document # 36] is DENIED in its entirety.

An Order consistent with this MEMORANDUM OPINION will be filed contemporaneously herewith.

### *ORDER*

For the reasons enumerated in the MEMORANDUM OPINION filed contemporaneously herewith,

It is ORDERED that Plaintiffs' Motion for Preliminary Injunction [Document # 36] is DENIED in its entirety.